## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CINDY KERMOADE, | ) | CASE NO. 8:10CV396 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.,* and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* The Court has carefully considered the record and the parties' briefs,[1] and the decision of the Commissioner will be affirmed for the reasons discussed below.

## PROCEDURAL BACKGROUND

The Plaintiff, Cindy Kermoade, filed for disability and SSI benefits on May 2, 2006. (Tr. 148-57.) Kermoade alleges that she has been disabled since August 31, 2004, based on hepatitis C antibodies, asthma, arthritis, partial hearing loss, carpal tunnel syndrome, depression, stomach problems, restless leg syndrome, and a hernia. (Tr. 172, 218, 226.) (Tr. 148, 153.) At the administrative hearing, Kermoade amended her alleged onset date to January 18, 2006, and her attorney stated that her primary complaints were arthritis and carpal tunnel syndrome. (Tr. 31.) Kermoade's claims were denied initially and on

---

[1]The Plaintiff's reply brief (Filing No. 23) was not considered. In its briefing schedule, the Court clearly did not contemplate a reply Brief. (Filing No. 16.)

reconsideration.   (Tr. 79-80, 82-83.)   An administrative hearing was held before Administrative Law Judge ("ALJ") Jan E. Dutton on February 25, 2009, and September 24, 2009.  (Tr. 28-77.)  On September 30, 2009, the ALJ issued a decision concluding that Kermoade is not "disabled" within the meaning of the Act and therefore is not eligible for either disability or SSI benefits.  (Tr. 15-25.)  The ALJ determined that, although Kermoade suffers from severe impairments, she has the residual functional capacity to perform light work such as that of a production assembler, cashier II, or hand packager.  (Tr. 17-24.) The Appeals Council denied Kermoade's request for review.  (Tr. 1-4.)  Kermoade now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").

Kermoade claims that the ALJ's decision was incorrect because the ALJ failed to: (1) explain the weight given to the opinion of Dr. Spethman, a state agency physician; (2) explain the weight given to the opinion of Dr. Anil Agarwal, a consultative examiner; and (3) support residual functional capacity findings with substantial evidence.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

### FACTUAL BACKGROUND

**Medical Records**

On August 27, 2004, Kermoade reported pain in her right arm to her medical provider, stating that she could not lift her arm and it felt "light."  The provider noted that her left hand was swollen.  (Tr. 247.)

2

On March 1, 2005, Kermoade told her medical provider that she could not work because her child had attention deficit hyperactive disorder ("ADHD") and she could not leave the child unsupervised in school for six hours daily.  (Tr. 245.)

On August 11, 2005, Kermoade complained of an earache and cough with worsening pain, ringing, and popping in her ear.  (Tr. 244.)  On August 25, 2005, Kermoade again reported a "plugged" right ear with hearing difficulty.  She was assessed with otititis, resolving.  (Tr. 243.)

On November 23, 2005, Kermoade went to the emergency room complaining of chest pain. (Tr. 274.)  A computerized tomography scan of her abdomen and chest x-rays were unremarkable.  (Tr. 286, 291.)  Her diagnosis was reflux with chest pain.  (Tr. 278.)

On December 8, 2005, an otolaryngologist evaluated Kermoade's hearing and determined that she had left conductive hearing loss due to middle ear pathology from previous trauma.  Options were discussed, and Kermoade decided to get a hearing aid.  (Tr. 299.)  A clinical audiologist fitted Kermoade for a hearing aid in her left ear on January 3, 2006.  (Tr. 293-94.)

On January 18, 2006, Kermoade reported that she had pain in her stomach, heartburn, indigestion, swelling, and a "pins and needles" feeling in her hands and fingers. (Tr. 309.)  Her provider assessed her with, among other things, epigastric pain and edema in her hands and feet.  (Tr. 310.)  On January 30, 2006, Kermoade reported that her stomach had improved.  (Tr. 307.)

On May 26, 2006, Kermoade reported that the first three fingers on both hands were numb.  (Tr. 416.)  She was diagnosed with bilateral carpal tunnel syndrome (Tr. 417.)

3

On July 6, 2006, Anil Agarwal, M.D., conducted a consultative evaluation. (Tr. 320.) Dr. Agarwal noted that Kermoade was diagnosed with hepatitis C in 1997 and that she was asymptomatic and on a "benign course." (Tr. 320-21.) Kermoade told him that she visited the emergency room "usually every other week" for asthma treatment and claimed that if she were working, she would have to miss work "for at least 2 months out of 6 months." (Tr. 321.) Despite Kermoade's statement that she visited the emergency room every other week for her asthma, she continued to smoke. She also stated that she had arthritis in her hands and feet, although Dr. Agarwal noted that she had never had any x-rays, physical therapy, or cortisone injections, and her tests for rheumatoid arthritis and other immune diseases were negative. (Tr. 321.) She claimed that she had twenty-five percent hearing loss in her left ear but could understand and communicate with normal conversation. Apparently she did not tell Dr. Agarwal she had a hearing aid. (Tr. 321.) Dr. Agarwal also noted that Kermoade was diagnosed with carpal tunnel syndrome and recorded her complaints of numbness, tingling, and pain. He noted that she had not had nerve conduction studies and her only treatment was wrist braces as needed. He also recorded a complaint of tennis elbow. He noted that she had not had x-rays or other images and that she had normal range of motion. (Tr. 322.) In summary, Dr. Agarwal's examination of Kermoade was unremarkable. (Tr. 324-30.) She had some tenderness in her lumbar spine. (Tr. 326.) She also had sensations in her medial nerve on both hands, along with positive Phalen's signs but negative Tinel's signs on both hands. (Tr. 329.) An x-ray of her right elbow showed no abnormalities. (Tr. 330.) Dr. Agarwal diagnosed her with hepatitis C (benign course), moderate asthma with frequent exacerbation for two of the past six months (causing her to miss a "great deal of work"), a history of arthritis of the hands and

4

feet, a history of partial hearing loss of twenty-five percent in the left ear,[2] and bilateral carpal tunnel syndrome.  (Tr. 330.)  Dr. Agarwal opined that she could sit for four hours and stand for five hours in an eight-hour workday.  Kermoade could lift fifteen and carry twenty pounds.  Dr. Agarwal stated that handling objects could "cause problems when her arthritis" flared.  (Tr. 331.)  He also noted that Kermoade could hear normally during conversation and speak without any problems.  (Tr. 331.)

On August 30, 2006, Gerald Spethman, M.D., a state agency physician, completed a residual functional capacity ("RFC") questionnaire.  (Tr. 349-56.)  He stated that Kermoade could occasionally lift twenty pounds; frequently lift ten pounds; stand, walk, or sit (with normal breaks) for six hours in an eight-hour workday; push or pull.  (Tr. 350.)  He opined that Kermoade could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (Tr. 351.)  Although Dr. Spethman noted that Dr. Agarwal diagnosed bilateral carpal tunnel syndrome; Dr. Spethman noted that no EMG studies had been done.  He noted that Kermoade's only treatment was wrist braces to be worn only when she had symptoms and that she did not wear them to her consultative examination.  He noted a positive Phalen's test but a negative Tinel's test.  An examination of Kermoade's upper extremities was "essentially normal."  (Tr. 350.)  Dr. Spethman noted that, despite Kermoade's complaints of arthritis, laboratory studies were normal, Kermoade had no evidence of arthritis in any joints, and the consultative medical examination revealed no evidence of arthritis.  (Tr. 351, 363.)

---

[2]Again, the fact that Kermoade had a hearing aid was not discussed.

5

Dr. Spethman explained the inconsistencies between his findings and those of Dr. Agarwal:

> In his [consultative examination] Dr. Agarwal makes the following statements as far as the work status of this claimant: 1. He says she can sit for 4 hours out of 8. I disagree with this because the claimant had a normal back exam and normal strength and sensation in her extremities and has had no ER or hospitalization visits for back problems. She also states that she can watch TV for 4 hours at a time. I think this indicates that she could sit for at least 6 hours with normal breaks. The second work status situation concerns Dr. Agarwal's stating that the claimant can stand for 5 hours out of 8 with normal [breaks]. . . . [T]he claimant says she can stand only 1 hour yet the work status here by Dr. Agarwal states that she can stand 5 hours. However with a normal back exam and no unusual x-rays and no ER or hospitalizations or doctor's visits for specific back problems, I feel that she ought to be able to stand 6 hours out of 8 with normal breaks. Dr. Agarwal states that the claimant could lift 15 lbs. and carry 20 lbs. and I think this seems reasonable according to the MER. He also states that handling objects could cause problems when her arthritis flares up. The problem is she's had no arthritic flare-ups according to the MER. All of her labs are normal and there are no x-rays to indicate any particular problems in any joint from an arthritic standpoint or that she's ever had a flare-up of her arthritis.

(Tr. 364.)

Dr. Spethman noted that Dr. Agarwal said Kermoade would have difficulty handling objects when she experienced arthritis flareups. Dr. Spethman repeated, however, that all laboratory studies were normal, no x-rays revealed any arthritis, and the consultative examination showed normal sensation in the upper extremities. (Tr. 352.)

Regarding speech and hearing, Dr. Spethman noted that while Kermoade's speech discrimination abilities were 100% in both ears, she opted for a hearing aid for her left ear to address moderate conductive hearing loss. (Tr. 353.) Kermoade had excellent word discrimination in both ears. (Tr. 363.) She said she could understand and communicate during normal conversation. (Tr. 353.)

6

Dr. Spethman also noted Kermoade's long history of smoking and her statement that she was diagnosed with asthma ten years earlier.  (Tr. 353.)  In finding that the medical records did not support this allegation, Dr. Spethman. wrote:

> Claimant's diagnosis of asthma was supposedly made about ten years ago with pulmonary function tests.  However, these are not in the chart and there are no other pulmonary function tests in the chart.  Her chest x-ray in November of 2005 showed no acute changes.  She has had visits to the docs in the past five years from 2001-2006 but usually they have been for colds and coughs related to URI's.   There have been no ER visits or hospitalizations in that period of time for her asthma.  In the [consultative examination] the claimant states she had missed 2 out of the last 6 months of work and that she was seen every other week for her asthma symptoms but there is no MER to support this.  She still has continued to smoke but does not meet the listing of 3.03.

(Tr. 363.)

Dr. Spethman noted Kermoade's 1997 diagnosis of Hepatitis C and the showing during the consultative examination that the disease had always remained dormant.  Kermoade had been asymptomatic, her liver function tests were normal with one minor elevation, and her C-reactive antibody was normal.   Dr. Spethman concluded that Kermoade's Hepatitis C was nonsevere.  (Tr. 363.)

Finally, Dr. Spethman found Kermoade only partially credible.  His assessment was based on the discrepancy between Kermoade's statement that she could not work or attend her daughter's school activities, and her ability to work for six months as a CNA before she was examined by Dr. Agarwal, during which time she had to provide patient care and lift heavy patients.  (Tr. 364.)

Michael Frumkin, M.D., completed an arthritis RFC questionnaire on December 26, 2006.  (Tr. 366-72.)  He recorded her diagnosis as polyarthralgias, calling her prognosis "good" and noting that she had bilateral joint soreness, stiffness, and edema.  (Tr. 366.)  He

7

checked boxes indicating that she had reduced range of motion in her hands, reduced grip strength, sensory and reflex changes, redness, swelling, muscle weakness, and impaired sleep.  (Tr. 366-67.)  Dr. Frumkin indicated that Kermoade's pain was frequently severe enough to interfere with her attention and concentration but opined that she was capable of high stress work.  (Tr. 367.)  He opined that Kermoade could walk only two blocks without resting or experiencing severe pain.  (Tr. 368.)  He indicated that Kermoade could sit for more than two hours (the maximum available on the form) and stand for forty-five minutes at a time before needing to change positions. (Tr. 368.)  Dr. Frumkin also opined that Kermoade could stand or walk for less than two hours in an eight-hour workday and could sit for "about" two hours in an eight-hour workday.  He wrote that Kermoade needed to change position frequently and had to walk for ten minutes at a time, eight times per day. (Tr. 369.)  Dr. Frumkin indicated that Kermoade had to take unscheduled breaks, sitting down for fifteen to twenty minutes every hour during the workday. (Tr. 369-70.) Dr. Frumkin checked the boxes indicating that Kermoade could frequently lift less than ten pounds and occasionally lift twenty pounds.  He indicated that Kermoade could frequently twist, occasionally stoop, crouch, and climb stairs, and rarely climb ladders.  (Tr. 370.)  He also indicated that Kermoade could: spend only two percent of an eight-hour workday grasping, turning, or twisting objects bilaterally; never perform fine manipulations; and could spend thirty percent of her workday reaching.  (Tr. 371.)  Finally, he opined that Kermoade would likely be absent from work more than four days per month.  (Tr. 371.)

On January 9, 2007, a nurse practitioner wrote that Kermoade's right hand and forearm were "quite edematous," and her left hand and arm were also somewhat swollen.

8

(Tr. 418.)   Kermoade stated that there was "no way" that she could work with her asthma and her need to pick her daughter up from school.  (Tr. 418.)

On January 18, 2007, Jay Kenik, M.D., a rheumatologist, wrote that Kermoade's arthralgias had an unclear etiology.  He noted that Kermoade's swelling episode in her right forearm was "self-limited," and his examination showed some fullness in her hands but otherwise was unremarkable.   Kermoade was able to make a full fist.  Dr. Kenik assessed Kermoade with arthralgias with an unclear etiology.  (Tr. 422.)

On February 13, 2007,  Kermoade stated that she was "very upset" because "the state [was] wanting her to get a job and [was] requiring 120 hours per month in communit[y] service projects."  (Tr. 419.)  Kermoade was "quite adamant" that she needed to stay at home in case her daughter had problems at school and needed to be picked up.  (Tr. 419.) Her provider also stated that Kermoade was "quite adamant" that she could not be outside in the wind or cold because of her asthma but stated she no longer had an inhaler or breathing treatment machine.  (Tr. 419.)

Dr. Kenik noted on April 20, 2007, that Kermoade's arthralgias appeared to be more typical of fibromyalgia.  (Tr. 421.) He wrote that Kermoade continued to have generalized arthralgias with some low back stiffness and discomfort, as well as peripheral numbness and tingling.  (Tr. 421.) He diagnosed Kermoade with fibromyalgia or arthralgias.  (Tr. 421.) Dr. Kenik encouraged Kermoade to start regular exercise, and he prescribed Cymbalta.  (Tr. 421.)  On May 18, 2007, Dr. Kenik wrote that Kermoade felt the Cymbalta was "helping." (Tr. 420.)  However, she complained of pain and some triggering in her right thumb.  An examination revealed some nodularity of the flexor tendon on her right thumb, with obvious triggering.  Dr. Kenik noted that her tender points remained "evident" but were "less in

9

extent." (Tr. 420.) He listed his assessment as fibromyalgia and stenosing tendinitis, and he injected Kermoade's right thumb.

On October 2, 2007, Kermoade asked Dr. Frumkin to fill out a Physician's Confidential Report to permit her "[t]o obtain an exemption from [E]mployment [F]irst activities due to physical condition." (Tr. 400, 402.) Dr. Frumkin noted her diagnoses of bilateral carpal tunnel syndrome, bilateral arthritis, asthma, and hepatitis C. He recorded her prognosis, including rehabilitation potential, as "good." (Tr. 400.) He also noted that she had decreased use of her hands and decreased manual dexterity. (Tr. 400.) Dr. Frumkin wrote that Kermoade was unable to lift, with decreased manual dexterity, and he restricted her from exposure to cold. (Tr. 401.)

On November 16, 2007, Kermoade broke her left distal radius in a roller skating accident. (Tr. 397.) Kermoade received a cast and, on November 19, 2007, Dr. Frumkin conducted a preoperative history and physical examination. (Tr. 426.) A chest x-ray was normal, revealing only borderline heart size. (Tr. 399, 427.) An electrocardiograph revealed sinus bradycardia but was otherwise normal. (Tr. 427.) The wrist fracture was successfully repaired through an open reduction and internal fixation. (Tr. 428.) An x-ray revealed a status post operative fixation of a fracture to her distal left radius. (Tr. 423.)

On January 11, 2008, Kermoade complained of swelling in her right wrist and hand. (Tr. 392.) The examiner diagnosed swelling in Kermoade's right wrist and hand, fibromyalgia, and acute chronic obstructive pulmonary disorder (COPD). (Tr. 393.)

On March 17, 2008, Kermoade reported that she had more pain and less sensation in her left hand since her November surgery. (Tr. 388.) She stated that it ached, throbbed,

10

and burned, with the aches going all the way into her shoulder at night.  (Tr. 388.)  She was diagnosed with left wrist pain and osteoarthritis.  (Tr. 389.)

On July 2, 2008, Dr. Frumkin again completed a Physician's Confidential Report for the state employment agency.  (Tr. 384-85.)  He indicated Kermoade's diagnoses as a fracture in her left wrist, bilateral carpal tunnel syndrome, bilateral arthritis, asthma, and hepatitis C.  (Tr. 384.)  He listed her prognosis for rehabilitation potential as "fair: to be seen." (Tr. 384.) Dr. Frumkin indicated that Kermoade's symptoms included nerve damage to her medial nerve, leading to increased pain and numbness in her left hand and wrist.  (Tr. 384.)  He indicated that she had no limitations in her activities of daily living, but in terms of  work and physical activity she could not lift or hold onto objects.  (Tr. 385.)  Dr. Frumkin opined that Kermoade should be exempted from state employment agency activities.  (Tr. 385.)

On July 31, 2008, Kermoade complained of recurrent pain and weakness in her left wrist and arm.  (Tr. 382.)  A chest x-ray taken that day was unremarkable; the report noted Kermoade was still smoking.  (Tr. 383.)  Kermoade was diagnosed with carpal tunnel syndrome and it was noted that a left carpal tunnel release was scheduled.  (Tr. 382.)

On September 19, 2008, Stephen Brown, M.D., Kermoade's orthopedic surgeon, examined her, noting that she was six weeks status post left hand carpal tunnel release and one year status post open reduction and internal fixation for the fracture in her left wrist.  (Tr. 441.)  Dr. Brown wrote that she was "doing very well" and that she denied any problems, stating that she was "happy with her hand and wrist." (Tr. 441.) Dr. Brown noted that she had good sensation in her fingers, with no numbness or tingling, and good grip strength and range of motion.  (Tr. 441.)  He concluded that she was doing "very well" on

11

the left side.  (Tr. 441.)  Dr. Brown also noted that she had "some mild median nerve compression" in her right hand.  He advised her to track it over the next four to six months, indicating that he would consider carpal tunnel release on the right hand if she desired.  (Tr. 441.)  Otherwise, Dr. Brown gave her a full release back to all of her regular activities, with no restrictions.  (Tr. 441.)

On several occasions in 2008 and 2009, Kermoade complained of coughing and difficulty breathing.  (Tr. 378-81, 432-35.)  She was assessed with, among other things, COPD, asthma, and acute or chronic bronchitis.  (Tr. 379, 381, 433, 435.)

On March 20, 2009, Kermoade complained of sharp chest pains.  (Tr. 436.)  She was assessed with, among other things, costochondritis in her ribs, bilateral carpal tunnel syndrome, asthma, and chronic pain.  (Tr. 437.)

On September 15, 2009, Dr. Frumkin completed another Physician's Confidential Report.  (Tr. 444.)  He listed Kermoade's diagnoses as bilateral carpal tunnel syndrome, bilateral osteoarthritis in her hands, asthma, and hepatitis C.  (Tr. 444.)  He listed her prognosis and rehabilitation potential as "good" and recommended physical therapy and further orthopedic or neurosurgery.  (Tr. 444-45.)  He indicated that she could not lift using her hands and had decreased fine dexterity, as well as cold-induced bronchiospasms and exercise-induced asthma.  (Tr. 445.)  In a Supplemental Physician's Report completed on the same day, Dr. Frumkin indicated that Kermoade could not participate in any work- or job-readiness activities at all and opined that this was "indefinite."  (Tr. 446.)  He wrote that she was unable to lift objects with her hands or exert fine dexterity.  (Tr. 446.)  He also wrote that she had severe problems with breathing due to COPD and asthma.  (Tr. 446.)

12

**Kermoade's Testimony**

At the initial hearing, which was continued to allow Kermoade's counsel to obtain additional medical records from her orthopedic specialist, Kermoade stated the main reasons she sought disability were her arthritis and carpal tunnel in her right hand, which had not been treated with surgery.  (Tr. 33, 36, 44.)  She is left-handed.  (Tr. 32.)  She was seeing Dr. Michael Frumkin, a general practitioner, for her complaint.  Dr. Frumkin had not referred her to a rheumatologist.  (Tr. 33.)

At the second hearing, Kermoade amended her onset date to January 18, 2006.  (Tr. 45.)  Also, Kermoade's attorney also mentioned hearing loss and Hepatitis C as bases for Kermoade's disability.  (Tr. 45.)

Kermoade testified that at the time of the second hearing she was fifty-three years old.  She earned a General Equivalency Diploma, and her status as a certified nursing assistant had lapsed.  (Tr. 46.)  Kermoade was single, and she had five children.  One child, age seventeen at the time of the hearing, lived with her.   The child was on Social Security disability for ADHD and having a mild mental handicap.  (Tr. 47.)  Kermoade also received child support for this child.  Kermoade's parents had guardianship for the other four children from 1990 or 1991 until they achieved the age of majority, because Kermoade was an alcoholic.  (Tr. 47-48.)  Kermoade worked to help support all of her children.  (Tr. 48-49.)

She worked as a CNA at Bergan Mercy Hospital from 1995 through 1999.  She contracted Hepatitis C at work.  Kermoade had the antibodies, but she was asymptomatic.  (Tr. 49-50.)  Kermoade stated she left her job under a mutual agreement because she was not getting along with her coworkers.  (Tr. 50-51.)  Kermoade then was a cashier at K-Mart until she left because of her asthma.  She also worked temporarily during a Christmas

13

season at Target.  (Tr. 51.)  In 2000, she unsuccessfully applied for disability because of

her asthma.  (Tr. 52.)  Kermoade testified that at the time of the hearing her asthma was

"somewhat under control" as she was taking breathing treatments and medications for her

condition.  Kermoade was eligible for Medicaid at the time of the hearing, because of her

daughter's status.  (Tr. 52.)

Returning to her work history, Kermoade described her nursing jobs between 2001

and 2004 at Beverly Health, Saint Joe's Villa, Right at Home, and Maxim Healthcare.  (Tr.

52-53.)  Kermoade testified that she stopped working in 2004 because of her arthritis and

asthma.  She had not worked since then and had not sought other employment because

of her arthritis in her hands.  (Tr. 54.)  She stated she could not lift anything and she

dropped things.  She said she could not carry a cup of coffee.  (Tr. 54.)  She had friends

come to help clean her house.  (Tr. 55.)  At the time of the hearing, a friend was staying with

Kermoade to help with housework and cooking.  (Tr. 63-64.)  Kermoade remembered being

evaluated by Dr. Jay Kenik, a rheumatologist, in 2007.  He told her to continue exercising

and referred her to her general practitioner.  (Tr. 55.)

Kermoade had a driver's license, but she did not have a car and had not driven in

two or three years.  She relied on buses, cabs, or walking.  She described her daily activities

on good days as including a little housework and laundry.  (Tr. 56.)  She said on bad days

she did not do anything, and on many days she did not even get out of bed.  (Tr. 56, 63-64.)

She testified that her asthma kept her from going outside on humid or cold days.  (Tr. 56.)

She continued to smoke four or five cigarettes daily, and she testified that she could not quit

despite being urged to do so by her physician.  (Tr. 57.)  Kermoade's current sources of

14

income were her daughter's disability payments, ADC, food stamps, child support, Medicaid, and section eight housing.  (Tr. 57-58.)

At the continued hearing on September 24, 2009, Kermoade stated that her asthma was "somewhat under control" with medication (Tr. 52.)  Kermoade described the carpal tunnel syndrome surgery done on her dominant left hand, treated by Dr. Stephen Brown.  (Tr. 59, 65.)  She had not had treatment for carpal tunnel syndrome in her right hand.  (Tr. 59.)  Kermoade also recalled surgery to put a pin in her broken wrist as a result of a rollerblading accident.  (Tr. 59-60.)  During Kermoade's testimony, the ALJ noted that in September 2008, Dr. Brown gave Kermoade a full release back to normal activities without restrictions.  (Tr. 60.)  Kermoade testified that she was prescribed up to three Hydrocodone with Tylenol pills daily for pain, and took "a couple."  (Tr. 61-62.)  She also took Clonazepam for leg cramps at night, and Lyrica and another arthritis medication.  (Tr. 62.)  She also took Tramadol for a hiatal hernia and stomach reflux.  (Tr. 63.)

**Vocational Expert's Testimony**

Gail Leonhardt,[3] a vocational expert, testified in response to a hypothetical question from the ALJ in which he outlined Kermoade's age, education, and work experience.  (Tr. 71-76.)  The ALJ's hypothetical individual occasionally could lift or carry twenty pounds and frequently lift or carry ten pounds (Tr. 72.)  She could stand, sit, or walk six hours in an eight-hour workday.  (Tr. 72.)  The individual could occasionally climb, balance, stoop, knee, crouch, and crawl.  (Tr. 72.)  She could use her hands for frequent, but not constant, handling, fingering, and feeling.  (Tr. 72.)  The individual: could not work in an excessively

---

[3]Mr. Leonhardt's curriculum vitae is in the record.  (Tr. 142-43.)

15

noisy workplace; had to avoid concentrated fumes, odors, dust, gases, humidity, and extreme cold or heat; and had to avoid hazards such as ladders or dangerous equipment. (Tr. 72.)  The vocational expert testified that the hypothetical individual could not perform her past work, but she could perform other jobs existing in significant numbers in the national and local economies such as a line production assembler, cashier, and hand packager.  Mr. Leonhardt explained that hand packaging work would be limited to the light, as opposed to medium, range.  (Tr. 73.)

## THE ALJ'S DECISION

After following the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920,[4] the ALJ concluded that Kermoade was not disabled in either the disability or the SSI context.  (Tr. 24.) Specifically, at step one the ALJ found that Kermoade had not performed substantial gainful work activity since January 18, 2006, the amended onset date.  At step two, the ALJ found the following medically determinable severe impairments: fibromyalgia/arthralgias; hepatitis C; hearing loss, with a left hearing aid; asthma; and "history of mild carpal tunnel syndrome affecting both hands, status post left carpal tunnel release in approximately August 2008 and status post open reduction and internal fixation of a left wrist fracture in approximately September 2007." (Tr. 17.)  At step three, the ALJ found that Kermoade's medically determinable impairments, either singly or collectively, did not meet Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings."  (Tr. 18.) The ALJ determined that Kermoade had the residual

---

[4]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits.  For simplicity, in making further references to the social security regulations the Court will only refer to disability regulations.

functional capacity to perform light work. (Tr. 18-23.) At step four, the ALJ determined that, Kermoade did not possess the RFC to perform her past relevant work. (Tr. 23.) At step five, the ALJ concluded that Kermoade could perform other light jobs that exist in significant numbers in the local and national economies: production assembler; cashier II; and hand packager. In summary, the ALJ found that Kermoade was not disabled for purposes of disability or SSI. (Tr. 23-24.) The ALJ found that Kermoade met the SSA's insured status requirements through September 30, 2009. (Tr. 17.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue,* 499 F.3d 835, 839 (8th Cir. 2007).

"'Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.'" *Slusser v. Astrue,* 557 F.3d 923, 925 (8th Cir. 2009) (quoting *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006)). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue,* 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Fredrickson v. Barnhart,* 359 F.3d 972, 976 (8th Cir. 2004).

17

**ANALYSIS**

I.      **Weight Given to Opinion of Dr. Spethman, a Nontreating, Nonexamining**

        **Physician**

        Kermoade argues that the ALJ did not discuss the weight given to Dr. Spethman's

opinion, thereby violating 20 C.F.R. § 404.1527(f)(2)(ii) and Social Security Ruling 96-2p.

Kermoade argues that the ALJ is required to discuss the weight given to a medical opinion,

in particular the opinion of a nontreating physician who did not examine her.

a.      **Weight**

        The applicable regulation provides:

> When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, the administrative law judge will evaluate the findings using the relevant factors in paragraphs (a) through (e) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions. Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

20 C.F.R. § 404.1527(f)(2)(ii).

        Kermoade argues this case is similar to *Willcockson v. Astrue,* 540 F.3d 878 (8th Cir.

2008).   The Court disagrees.   In *Willcockson,* the Eighth Circuit Court of Appeals

determined that an explanation for the reliance on a nontreating and nonexamining

physician's opinion by the ALJ was necessary because additional relevant medical evidence

was obtained during the seventeen months that passed between the physician's opinion

18

and the claimant's administrative hearing.  That evidence was deemed relevant to the reviewing physician's opinion. *Id.* at 880.  In Kermoade's case, however, all of the pertinent medical evidence that post-dated Dr. Spethman's opinion related to Kermoade's broken wrist and carpal tunnel treatment and surgery.  On August 30, 2006, Kermoade's orthopedic surgeon, Dr. Brown, released Kermoade without restrictions.  Medical records do not reflect that she sought further treatment or surgery for her right hand.  Any other medical evidence that followed the release of Dr. Spethman's opinion related to minor complaints such as coughing.  Therefore, the Court declines to apply the logic of the *Willcockson* decision in this case because the medical evidence obtained after the date Dr. Spethman rendered his opinion fully supported his opinion and was otherwise irrelevant to the opinion.

Certainly, the ALJ's opinion could have included a specific section devoted to the weight accorded to Dr. Spethman's opinion.  However, a reading of the ALJ's opinion, with an in-depth discussion of Dr. Spethman's findings, clearly shows that the ALJ very carefully considered Dr. Spethman's opinion and afforded it great weight.  Moreover, as shown above, a thorough reading of Dr. Spethman's letter that accompanied his completed checklist thoroughly explained the underpinnings of his opinion in addition to why it differed from Dr. Agarwal's opinion and other medical evidence.  Insofar as the ALJ's absence of a discussion specifically including a reference to the weight given to Dr. Spethman's opinion may be considered a deficiency, the Court notes the Eighth Circuit Court of Appeals' position that a deficiency in opinion writing does not require a reversal or remand where the result is not affected. *Id.; Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir. 2004).  Because Dr. Spethman's opinion thoroughly summarizes the medical evidence of record, and is consistent with Dr. Brown's later release to full activity,  any deficiency in failing

19

specifically to address the "weight" given to his opinion does not affect the result in Kermoade's case.  Therefore, this argument does not support reversal or remand.

**b.      Status of a Nontreating, Nonexamining Physician**

"[T]he opinions of nonexamining sources are generally, but not always, given less weight than those of examining sources."  *Willcockson,* 540 F.3d at 880 (citing 20 C.F.R. § 404.1527(d)(1)).  An ALJ may consider an independent medical opinion as a factor in determining the nature and severity of a claimant's impairment.  *Casey v. Astrue,* 503 F.3d 687, 697 (8th Cir. 2007).  "When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions."  *Cantrell v. Apfel,* 231 F.3d 1104, 1107 (8th Cir.2000). Generally, a nontreating physician's opinion does not constitute substantial evidence on the record as a whole, particularly where that opinion is inconsistent with a treating physician's opinion.  However, the Eighth Circuit "has recognized two exceptions to this general rule" and has "upheld an ALJ's decision to discount or even disregard the opinion of a treating physician (1) where other medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  *Wagner v. Astrue,* 499 F.3d 842, 849 (8th Cir. 2007).  The ALJ has a duty to examine the record as a whole, and "[i]t is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record."  *Prosch v. Apfel,* 201 F.3d 1010, 1013–14 (8th Cir.2000).  In many instances an ALJ was allowed to credit other medical evaluations over that of the treating physician when the other assessments are supported by better or more thorough medical evidence.

20

See, e.g., id. at 1014; Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) (stating that a treating physician's opinion that is inconsistent with the medical evidence as a whole may be given less weight, as the ALJ's duty is to resolve conflicts in the evidence); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (stating that the Eighth Circuit has allowed the substitution of "opinions of non-treating physicians where a treating physician 'renders inconsistent opinions that undermine the credibility of such opinions'") (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).

In this case, for the reasons best explained by Dr. Spethman in his letter that accompanied his RFC evaluation, the opinion of Dr. Frumkin, Kermoade's treating physician, is inconsistent and not supported by the medical evidence in the record as a whole.  Most important are the following factors: Kermoade's Hepatitis C has been asymptomatic; the lack of evidence of asthma, combined with Kermoade's long history of smoking; the lack of specific medical evidence of arthritis; and Dr. Brown's release of Kermoade to normal activities without restrictions following her carpal tunnel surgery.[5] Kermoade complained of carpal tunnel syndrome in her right hand, yet she did not return to Dr. Brown for surgery as he suggested if she were to continue to have pain in that hand. Dr. Spethman's opinion was thoroughly described and discussed by the ALJ.  The absence of specific words of comparison between his opinion and others does not itself require reversal or remand.

--------

[5]The record also shows Kermoade based her claim of disability on depression, stomach problems, restless leg syndrome, and a hernia.  However, at the hearing Kermoade, through counsel, acknowledged that she was not relaying on depression as a basis for her claim.  The medical records include little, if any, evidence of stomach problems, restless leg syndrome, or a hernia, and as of the time of her administrative hearing these matters were not included in Kermoade's list of claimed impairments.

## II.     Weight Given to Opinion of Dr. Anil Agarwal

Kermoade raises a similar argument with respect to a consultative examiner, Dr. Agarwal, arguing the ALJ did not explain the weight she gave to his opinion. Kermoade believes more credence should have been given to Dr. Agarwal's opinion because he examined Kermoade once on a consultative basis and because he is an orthopedic surgeon.

Again, the ALJ's opinion could have included a specific explanation of the weight given to Dr. Agarwal's opinion. However, she thoroughly discussed his opinion in some detail in conjunction with her discussion of Dr. Spethman's opinion. As in the case of the ALJ's handling of Dr. Spethman's opinion, Dr. Agarwal's opinion was based on a 2006 consultative examination and primarily related to Kermoade's complaints of carpal tunnel syndrome. In 2008, Dr. Brown, Kermoade's orthopedic surgeon who performed her carpal tunnel surgery as well as surgery for her broken wrist, released her without any restrictions. Dr. Brown's records were not available to Dr. Agarwal in 2006, and for this reason and because Dr. Agarwal's opinion was inconsistent with other medical evidence, it is of limited value.

## III.     Residual Functional Capacity

Kermoade argues that the ALJ's RFC findings regarding her ability to do light work and, specifically, her abilities to (1) stand for six hours in an eight-hour workday and (2) to frequently finger, handle, and feel, are not supported by substantial evidence and were based solely on Dr. Spethman's opinion. She argues that Dr. Brown's unrestricted release to normal activities was not substantial evidence as it lacked other support in the record.

22

RFC is defined as "the most [a claimant] can still do despite" his or her "physical or mental limitations." *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004) (quoting (20 C.F.R. § 404.1545(a)). The ALJ bears the primary responsibility for determining a claimant's RFC, a medical question that must be supported by "some medical evidence," as well as "observations of treating physicians and others, and claimant's own description of her limitations." *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir.2010); *Jones v. Astrue,* 619 F.3d 963, 971 (8th Cir. 2010). A nontreating physician's opinion may constitute substantial evidence in support of an RFC determination. *Smallwood v. Chater,* 65 F.3d 87, 89 (8th Cir. 1995). The burden of proving RFC lies with the claimant. *Martise v. Astrue,* 641 F.3d 909, 923 (8th Cir. 2011).

> In this case, the ALJ performed an RFC analysis and concluded that Kermoade can:
>
> occasionally lift or carry 20 pounds and frequently lift or carry ten pounds. She can stand, sit, or walk for six hours in an eight-hour day; occasionally perform postural activities, which include climbing, balancing, stooping, kneeling, crouching, and crawling; and use her hands for frequent but not constant handling, fingering, and feeling. She has no restrictions of hearing, but should avoid work in an excessively noisy work area. She has 100% speech discrimination ability and was able to hear the proceedings at her hearing. Because of her asthma, she should avoid concentrated fumes, odors, dust, gases, humidity, extreme heat, and extreme cold. She should avoid hazards, including ladders and dangerous equipment.

(Tr. 18.)

Kermoade's argument that, in determining her RFC, the ALJ was not entitled to rely on Dr. Spethman's opinion, because he was not a treating physician, is misplaced. As stated above, the in determining RFC an ALJ is entitled to rely on all evidence of record, including the opinions of nontreating physicians. For the reasons discussed earlier in this

23

opinion, Dr. Spethman's opinion was properly relied upon as substantial evidence.  His opinion was soundly supported by that of Kermoade's orthopedic surgeon, Dr. Brown.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision was supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED:

1.     The Commissioner's decision is affirmed;

2.     The appeal is denied; and

3.     Judgment in favor of the Defendant will be entered in a separate document.

DATED this 11[h] of July, 2011.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge